UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

FRANCISCO ACEVEDO,

                          Plaintiff,

             -v-

BRIAN FISCHER, et al.,

                     Defendants.

------------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 29 2014

No. 12-cv-6866 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

      In this § 1983 action, incarcerated *pro se* Plaintiff Francisco Acevedo asserts that he suffered a number of injuries while confined at three different prisons. He names twenty-three Defendants in his Second Amended Complaint ("SAC"), including a Westchester County Assistant District Attorney, detective from the Yonkers Police Department, and investigator from the New York State Inspector General's office who were involved in his prosecution; a mental health professional from the Green Haven Correctional Facility who diagnosed and treated him; and various corrections officers and supervisory officials from the prisons where he was incarcerated. The SAC alleges that Defendants improperly took a sample of his DNA, monitored his mail and disseminated the contents of that mail to other inmates, placed him on "suicide watch" without justification, harassed and verbally abused him, searched his prison cell without cause, and denied him due process when imposing various disciplinary sanctions. Acevedo seeks compensatory and punitive damages and injunctive relief.

      Defendants have moved to dismiss the SAC for failure to state a claim. For the following reasons, the motions are granted in part and denied in part. Specifically, all of Acevedo's claims are dismissed, with the exception of his First Amendment claims against Defendants Geiss,

Serrano, Lee, and Warrington for allegedly monitoring and interfering with his mail without good cause to do so.

## BACKGROUND

The Court takes judicial notice that Plaintiff is currently serving a sentence of seventy-five years to life in prison as a result of his convictions for second-degree murder.[1] He was convicted after his DNA was found to match DNA found on his victims; many of his allegations in this case assert that various correctional employees attempted to coerce and pressure him into dropping his direct appeal of his criminal convictions, which apparently challenges the legality of the initial taking of his DNA. (See, e.g., SAC at 19;[2] State Defs.' Reply at 3 n.2.) Acevedo asserts that his constitutional rights were violated at three different institutions: Green Haven, Great Meadow, and Sullivan Correctional Facilities.[3]

The SAC spans thirty-three handwritten pages, and Acevedo has attached over two hundred additional pages of exhibits. In lieu of attempting to describe Acevedo's lengthy allegations at the outset, the Court will describe them individually in the following Section, when it assesses their sufficiency.

Plaintiff filed his initial Complaint on September 10, 2012. (ECF No. 2.) The Court dismissed certain claims and certain Defendants in its screening of the Complaint pursuant to 28 U.S.C. § 1915A. (ECF No. 6.) Plaintiff then filed a First Amended Complaint on January 18,

---

[1]     See New York State Department of Corrections and Community Supervision Inmate Lookup, http://nysdoccslookup.doccs.ny.gov/ (using Acevedo's identification number, 09-A-2456) (last visited September 8, 2014); see also State Defs.' Reply Br. at 3 n.2. Acevedo's incarceration, current sentence, and convictions are the appropriate subject of judicial notice. See Safran v. Superintendent of Gouverneur Corr. Facility, 13-CV-4060 PKC, 2013 WL 3938866, at *2 (E.D.N.Y. July 30, 2013) (taking judicial notice of petitioner's incarceration, sentence, and conviction based on the Department of Corrections website).

[2]     All citations to the SAC refer to its ECF pagination. Because of the length of the SAC, it has been uploaded to ECF in six parts. Citations to the SAC refer to document number 56; otherwise, the Court will indicate to which part it is referring (e.g., "SAC, ECF No. 56-4 at 21").

[3]     Neither the SAC nor any documents filed in connection with the instant motions describe the dates that Acevedo was housed at each facility.

2013. (ECF No. 7.) After Defendants moved to dismiss, Plaintiff sought—and the Court

granted—leave to file the SAC. (ECF No. 38.) Defendants again moved to dismiss (ECF Nos.

93, 98), and Plaintiff, after receiving several extensions, filed over 550 pages in opposition (ECF

No. 115)—many of which are irrelevant and attempt to challenge various evidentiary and other

rulings made by the trial judge in Acevedo's criminal case.

Defendants' motions were fully submitted as of August 21, 2014. (ECF No. 129.)

## DISCUSSION

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009). Under this familiar standard, the Court assumes that "well-pleaded factual

allegations" are true, disregards legal conclusions that are not entitled to an assumption of truth,

and assesses whether the complaint "allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Id. at 678-79. Determining whether a complaint

satisfies this standard is "a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." Id. at 679.

In undertaking this inquiry, the reviewing court is limited to the text of the complaint,

"any written instrument attached to the complaint as an exhibit or incorporated in the complaint

by reference," and "documents upon which the complaint relies and which are integral to the

complaint." Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005).

Moreover, where, as here, the plaintiff is *pro se*, the complaint must be read liberally "with

special solicitude" and interpreted "to raise the strongest claims that it suggests." Hill v.

Curcione, 657 F.3d 116, 122 (2d Cir. 2011). Although litigants generally may not constructively

amend their complaint by raising new factual allegations in their opposition papers, see, e.g.,

3

Rosado v. Herard, 12-cv-8943, 2014 WL 1303513, at *11 (S.D.N.Y. Mar. 25, 2014), courts often

consider such assertions when made by *pro se* litigants, see, e.g., id.; Rodriguez v. Rodriguez,

10-cv-00891 LGS, 2013 WL 4779639, at *1 (S.D.N.Y. July 8, 2013). In view of Acevedo's *pro*

*se* status, the Court considers new factual allegations raised in his opposition both when

determining whether the SAC survives Defendants' motions and in determining whether

granting leave to amend would be futile.[4]

Broadly speaking, the SAC's claims can be divided into seven categories, which the

Court now considers.

**1.    Mail Monitoring Claims**

Acevedo alleges that Defendants Ward, Geiss, Serrano, and Lee monitored his mail—

without his knowledge or consent—and then disclosed the contents of that mail to other inmates

in a "psychological ploy to extort and coerce a false confession." (SAC at 5-6.) In particular,

the SAC alleges that Westchester County Assistant District Attorney Tim Ward attempted to

"introduce a box full of letters spanning 3 yrs. and 3 prisons into evidence" at a pretrial

suppression hearing. (Id. at 5.) When the trial judge asked Ward where he obtained the letters,

Ward allegedly stated that he "got them from I.G."—apparently, the state Inspector General's

office—who, in turn, "got them from the Warden." (Id.) Acevedo names Defendant William

Lee—the superintendent of Green Haven, which is apparently one of the prisons where Acevedo

---

[4]       Acevedo's opposition clarifies several of the allegations from the SAC; those clarifications are discussed in
the body of this Opinion. Acevedo's opposition also raises a number of new claims. In particular, he asserts that the
trial court erred in a number of its evidentiary rulings (ECF No. 115 at 21); argues that an eyewitness photo
identification was improperly tainted (id. at 115); challenges the sufficiency of the evidence against him (id. at 23);
and claims that his counsel was ineffective (id. at 33). Each of these allegations either fail to state a plausible
Section 1983 claim or are barred by the Supreme Court's holding in Heck v. Humphrey, 512 U.S. 477, 486-87
(1994) ("We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for
other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff
must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order,
declared invalid by a state tribunal authorized to make such determination, or called into question by a federal
court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254."). Additionally, the Court denies Acevedo's request
for a Frye hearing "to establish the current acceptance of polygraph testing as reliable." (ECF No. 115-2 at 34.)

was housed during the monitoring—as well as Defendant Anselmo "Sonny" Serrano, who was the individual at the Inspector General's office responsible for obtaining the letters. (Id.) Defendant Geiss was the detective assigned to investigate Acevedo; attached to the SAC is a memorandum from Geiss stating that he reviewed twenty-five letters either addressed to or sent by Acevedo from prison over approximately a four-month period in late 2009 and early 2010. (Id. at 38.) Another memorandum from Detective Geiss, which Acevedo submitted with his opposition, confirms that Acevedo was placed on a "mail watch" and states that Geiss obtained the letters from Defendant Serrano. (See Pl.'s Opp. at ECF No. 115-9 at 13, 18.) According to the SAC, this "uninformed mail watch" did not "serv[e] any legitimate penological interest" but rather was aimed at acquiring evidence "to use in an indictment and trial." (SAC at 5.)

The Second Circuit has recognized that the First Amendment protects "a prisoner's right to the free flow of incoming and outgoing mail." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). This right, however, is not unlimited. "[T]here is no question that prison officials may open incoming mail to ensure that no contraband is contained in the correspondence." Word v. Croce, 169 F. Supp. 2d 219, 228 (S.D.N.Y. 2001). Moreover, "interception of a defendant's prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail." United States v. Felipe, 148 F.3d 101, 108 (2d Cir. 1998); accord United States v. Workman, 80 F.3d 688, 698 (2d Cir. 1996).

The Second Circuit has not provided a precise definition of what constitutes "good or reasonable cause" to read an inmate's mail. The Circuit has, however, explained that when determining whether an inmate's mail may be read, courts should employ "the same First Amendment analysis" the Supreme Court uses when addressing the broader question of whether

5

a prison regulation impermissibly infringes on a prisoner's right to send and receive mail.
Heimerle v. Attorney Gen., 753 F.2d 10, 12 (2d Cir. 1985); see Workman, 80 F.3d at 698. In
those cases, the Supreme Court has drawn a distinction between incoming and outgoing mail:
limitations on outgoing mail must "further[ ] one or more of the substantial governmental
interests of security, order, and rehabilitation," and the restriction "must be no greater than is
necessary or essential to the protection of the particular governmental interest involved."
Thornburgh v. Abbott, 490 U.S. 401, 408 (1989) (quoting Procunier v. Martinez, 416 U.S. 396,
413 (1974)); id. at 413 (explaining that the Martinez standard applies to outgoing mail).
Regulations on incoming mail are subject to a less rigorous standard—one that considers only
whether the restriction is "reasonably related to legitimate penological interests." Id. at 409
(quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).[5]

Here, Defendants rely on cases that found no First Amendment violation when prisoners'
mail was monitored in the following circumstances: after officials learned an inmate was "the
leader of the Latin Kings, was actively recruiting new members, had violated prison regulations
related to mail, and had written about the commission of illegal acts," United States v. Felipe,
148 F.3d 101, 108 (2d Cir. 1998); after an inmate assaulted a correctional officer and wrote a
letter to his girlfriend about the assault, Ford v. Phillips, 05 CIV. 6646 (NRB), 2007 WL 946703,
at *14 (S.D.N.Y. Mar. 27, 2007); and after prison officials learned that an inmate had been
involved in the transmission of "kited" letters—letters secretly addressed to other inmates, see

---

[5]      The Court also notes that New York's prison regulations provide that after being inspected for contraband,
and absent certain exceptions, incoming mail "will not be read unless there is evidence that the correspondence may
contain one or more of the following: (1) plans for sending contraband in or out of the facility; (2) plans for criminal
activity, including escape; or (3) information which, if communicated, would create a clear and present danger to the
safety of persons and/or the security and good order of the facility." N.Y. Comp. Codes R. & Regs. tit. 7,
§ 720.4(e). The reading of outgoing mail, again with certain exceptions, requires the written authorization of the
facility superintendent and "reason to believe that the provisions of any department directive, rule or regulation have
been violated, that any applicable state or Federal law has been violated, or that such mail threatens the safety,
security, or good order of a facility or the safety or well being of any person." Id. § 720.3(e).

Ford v. Fischer, 539 F. App'x 19, 20 (2d Cir. 2013).[6]

Each of these cases, however, concerns inmates who continued to commit crimes while imprisoned, and is focused on the need to prevent future crimes or threats to the safety and order of the institution. Here, Defendants' only argument is that the purpose of the alleged mail watch was to "assist[ ]" in the "criminal investigation and prosecution" of Acevedo for the murders of which he was eventually convicted—the last of which occurred, according to the material Defendants cite, over one decade before the alleged mail watch began. (See State Defs.' Br. at 10-11 & n.9.) There is no indication in the SAC or in Defendants' submissions that Acevedo continued to commit additional crimes while imprisoned or attempted to influence witnesses or jurors who were to be involved in his upcoming murder trial.[7]

The contention that the alleged mail watch was justified to "assist" in the "criminal investigation and prosecution" of Acevedo is not apparent from the face of the SAC. Without a better developed record, the Court cannot say that any alleged mail watch was necessarily justified as a matter of law. See Knight v. Keane, 247 F. Supp. 2d 379, 384 (S.D.N.Y. 2002) (declining to dismiss plaintiff's mail watch claim on 12(b)(6) motion and explaining that "the record evidence is insufficient to establish that inspection of plaintiff's mail was based on good cause").

The claim against Defendant Ward must be dismissed for an independent reason,

---

[6] Both Phillips and Fischer involved grants of summary judgment, not the dismissal of the complaints at the pleading stage. Fischer, 539 F. App'x at 19; Phillips, 2007 WL 946703, at *1.

[7] At least one court in this District has held that pretrial detainees have some expectation of privacy in both their incoming and outgoing legal mail. United States v. Heatley, 41 F. Supp. 2d 284, 289 (S.D.N.Y. 1999) ("The government's sweeping assertions to the contrary notwithstanding, Cuff did have an expectation of privacy in his non-legal mail that he may seek to protect here. Although the government is correct that applicable regulations permit prison authorities to inspect and read incoming and outgoing mail, that permission is not boundless."). Because Defendant Ward allegedly attempted to introduce the intercepted letters into evidence at a "pre trial suppression hearing[ ]" (SAC at 5), and because Defendants' justification for allegedly monitoring Acevedo's mail is not clear from the face of the SAC, the Court declines to dismiss this claim at this stage.

however: he enjoys absolute prosecutorial immunity. (County Def.'s Br. at 13-16.)

"A prosecutor acting in the role of an advocate in connection with a judicial proceeding is entitled to absolute immunity for all acts intimately associated with the judicial phase of the criminal process." Simon v. City of New York, 727 F.3d 167, 171 (2d Cir. 2013). These acts generally include "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas." Id. On the other hand, "[i]nvestigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and they do not become prosecutorial functions merely because a prosecutor has chosen to participate." Id. at 172.

The SAC alleges that ADA Ward (1) attempted to introduce the letters into evidence at a pretrial suppression hearing and (2) was present in the courtroom when Acevedo complained to the trial judge that other inmates knew the contents of his letters. (SAC at 5-6.) In both cases, Ward was involved in presenting the case to the trial court, see, e.g., Burns v. Reed, 500 U.S. 478, 492 (1991) (concluding that a prosecutor was entitled to absolute immunity based on evidence presented at a hearing to obtain a search warrant), and Acevedo has not alleged any facts (aside from speculation) that Ward was otherwise involved in the alleged mail watch "conspiracy." Ward therefore enjoys absolute immunity. See Crooker v. United States, CIV.A. 08-10149-PBS, 2010 WL 3860597, at *10-*13 (D. Mass. Sept. 29, 2010) (concluding that an Assistant United States Attorney was entitled to absolute immunity for her role in the monitoring and copying of a prisoner's mail). Because Acevedo does not raise any other claims against Ward, Defendant Ward will be dismissed from the lawsuit.

Additionally, according to the docket, Defendant Serrano has not yet been served with

the SAC. This does not appear to be any fault of Acevedo's, however. When the Court issued its Order of Service after Acevedo filed the SAC, the Order did not instruct the Clerk of Court to issue a summons for Defendant Serrano. (ECF No. 57 at 1). Accordingly, the Court is issuing a separate order of service in connection with this Opinion and Order that will permit Acevedo to serve Serrano with the SAC. This conclusion is, of course, without prejudice to any defenses Serrano wishes to raise against the SAC.

The SAC does adequately allege that Defendants Lee and Geiss were involved in the allegedly improper mail watch. Documents attached to the SAC and Acevedo's opposition demonstrate that Defendant Geiss reviewed Acevedo's letters (SAC at 38; ECF No. 115-9 at 13), and Acevedo's allegation that Defendant Ward stated that the facility superintendent provided the letters to the Inspector General's office is sufficient, at this stage, to raise a plausible inference that Defendant Lee was personally involved in the mail watch. The SAC thus states a plausible First Amendment claim against Geiss and Lee, and the Court declines to dismiss *sua sponte* the mail watch claim against Serrano.

**2.    Claims Related to the Taking of Acevedo's DNA**

Acevedo next alleges: "The illegal taking of my D.N.A. which led to my current conviction was a crucial point in my defense at trial, and remains a crucial point of my direct appeal." (SAC at 19.) He then alleges that "Warden Lee" (a reference, the Court assumes, to Defendant Superintendent Lee) and four other individuals not named as defendants "conspired to coerce, intimidate and penalize me for and into giving a mandatory voluntary D.N.A. sample which would then moot all legal arguments at trial or on appeal as to the legality of the first illegal DNA taking." (Id.) Lee and the others allegedly effected this plan by transporting Acevedo to another facility where there was a "team in full riot gear" waiting and his DNA

9

sample was then "taken under protest." (Id. at 20.) Later in the SAC, Acevedo alleges that "Defendants #1 (Fischer) and #2 (Lee) has repeatedly had correction officers and counselors at both Green Haven and Great Meadow try to have me volunteer or transfer my D.N.A. or sample already in databank to a new location in databank. Although my D.N.A. has twice been taken, Defendant #2 (Lee) himself threatened me in the S.H.U. at Green Haven to physically forcefully take my D.N.A." (Id. at 31.)

Like many other states, New York requires individuals convicted of certain crimes to provide a DNA sample to be maintained in a criminal database. See N.Y. Exec. Law § 995-c(3). In particular, any "person convicted of any felony defined in any chapter of the laws of the state or any misdemeanor defined in the penal law," with certain exceptions not relevant here, must provide a DNA sample "subsequent to conviction and sentencing." Id. § 995(7); id. § 995-c(3). The Second Circuit has affirmed the constitutionality of this statutory scheme. Nicholas v. Goord, 430 F.3d 652, 672 (2d Cir. 2005).

Here, as described above, Acevedo has been convicted of second-degree murder. The allegedly improper DNA sampling described in the SAC occurred on January 31, 2013, according to Acevedo. (SAC at 20.) Although the record does not provide the exact date on which Acevedo was convicted of second degree murder, the other allegations in and attachments to the SAC make clear that he was convicted well before January 31, 2013. (See SAC at 19 (noting that "upon conviction," the trial court issued an order dated December 8, 2011, ordering that Acevedo be sent back to Green Haven but not specifying that DNA should be taken); id., ECF No. 56-2, at 24 (letter from Acevedo's attorney, dated November 12, 2012, stating that she would not be able to continue representing him in the appeal of his conviction); see also id., ECF No. 56-4 at 9-10 (facility's response to Acevedo's grievance regarding the improper taking of his

DNA, which notes that his grievance was denied because "Executive Law 957 mandates DNA be taken from offenders after conviction" and that "[t]his committee has no authority to limit that law").) Because Acevedo's sample was taken after his conviction for second degree murder, his allegations do not state a plausible constitutional claim.

In his opposition to Defendants' motions, Acevedo appears to argue that Defendants did not have probable cause for the initial taking of his DNA—the sample that led to his prosecution for murder. (See, e.g., Pl.'s Opp., ECF No. 115-2 at 12.) The parties agree that the DNA linking Acevedo to his victims was a crucial piece of evidence against him in his trial. (See, e.g., SAC at 19 ("The illegal taking of my D.N.A. which led to my current conviction was a crucial point in my defense at trial . . . ."); State Defs.' Reply at 5 (noting that "plaintiff's DNA sample linked him to three serial killings"). It is therefore clear from the face of the SAC that a conclusion that the initial taking was unconstitutional would almost certainly result in the reversal of Acevedo's convictions. Accordingly, his claim is not cognizable under Section 1983. See Heck v. Humphrey, 512 U.S. 477, 486 (1994); Clayton v. City of Poughkeepsie, 06 CIV.4881 SCR, 2007 WL 2154196, at *4-*5 (S.D.N.Y. June 21, 2007) (granting defendant's motion to dismiss a section 1983 claim premised on a Fourth Amendment violation, where it was clear that a finding that the search at issue was unconstitutional would have invalidated the underlying conviction).[8]

Finally, the SAC and Plaintiff's opposition describe a number of attempts and threats to take his DNA. The mere threat to take his DNA does not state a Section 1983 claim: as described more fully in the following sections, "verbal abuse and threats of violence, even if inappropriate or reprehensible, are not actionable under § 1983, as they do not violate any protected federal right." Toliver v. New York City Dep't of Corr., 10 CIV. 822 RJS JCF, 2013

---

[8]    Insofar as Acevedo attempts to assert in his opposition that his DNA was taken on some other occasion—apart from the initial taking and the post-conviction sampling—his assertions are too vague and conclusory to provide a sufficient factual basis for making out a plausible constitutional claim.

WL 3779125, at *14 (S.D.N.Y. July 8, 2013). And nowhere has Acevedo plausibly alleged that the attempts to take his DNA rise to the level of a constitutional injury. Accordingly, Acevedo's claims related to the alleged improper taking of his DNA are dismissed.

### 3.    Claim that Acevedo Was Improperly Placed on Suicide Watch at Green Haven Correctional Facility

Acevedo alleges that on February 15, 2012, he was escorted to the "Psychiatric Satellite Unit," where Defendant Dr. Patil placed him "on suicide watch in a strip cell" and then kept him "in observation for 30 days." (SAC at 9.) While under observation, Acevedo was allegedly deprived of various phone and mail privileges. (Id.)[9]

The SAC alleges that Dr. Patil asked Acevedo about various complaints he had filed against prison officials, "insisted" that his complaints "were unfounded," and "made it clear" that Acevedo "would not be returning to [his] cell or gen. population." (Id.) The SAC further alleges that Dr. Patil told Acevedo that "it would be best if you just go along with the program," and encouraged him to volunteer for the "I.C.P. program," which Acevedo "refused, because [he has] never had nor [does he] now have a mental health issue which merits being placed in the P.S.U., I.C.P. or B.H.U." (Id.)[10] Acevedo also alleges that Dr. Patil explained to Acevedo that the longer he refused to enter the I.C.P. program, the longer he would remain in the Psychiatric Satellite Unit; that Dr. Patil told him "you can't win"; and that Dr. Patil diagnosed him "SM1

---

[9]    Acevedo also alleges that he was "precluded from filing [his] direct appeal" while under suicide watch. (Id. at 9.) To the extent he seeks to assert a denial of access to the Courts claim with this allegation, such a claim fails because he has not plausibly alleged that he suffered "actual injury, such as the dismissal of an otherwise meritorious legal claim on direct appeal." Antrobus v. City of New York, 11 CIV. 2524 RA, 2014 WL 1285648, at *3 (S.D.N.Y. Mar. 27, 2014). The SAC is full of references to the arguments Acevedo has raised on his direct appeal and allegations that Defendants attempted to coerce him into dropping his appeal. (See, e.g., SAC at 19 (noting that the illegal taking of Acevedo's DNA "remains a crucial point of [his] direct appeal").) Nowhere does Acevedo allege that his appeal was dismissed as a result of his placement in the Psychiatric Satellite Unit.

[10]    The Court infers that the "P.S.U." is the "Psychiatric Satellite Unit," the "I.C.P." is the "Intermediate Care Unit," see Campbell v. Kuhlmann, 91CIV6766(SAS)(DFE), 1998 WL 249196, at *1 (S.D.N.Y. May 15, 1998), and the "B.H.U." is the "Behavioral Health Unit," see Randle v. Alexander, 10 CIV. 09235 BSJ, 2011 WL 1226228, at *1 & n.2 (S.D.N.Y. Mar. 22, 2011).

without merit or justification." (Id. at 10-11.)

The Court construes these allegations as seeking to assert a due process claim. To plead such a claim, a plaintiff must plausibly allege that "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001); see also Houston v. Cotter, 07-CV-3256 JFB GRB, 2014 WL 1246067, at *10-*11 (E.D.N.Y. Mar. 27, 2014) (explaining that prisoner's allegedly improper placement on suicide watch was cognizable as a due process claim).

Defendants assert that the thirty days Plaintiff allegedly spent on suicide watch are insufficient to create a protected liberty interest. See State Defs.' Br. at 14-15 (citing Palmer v. Richards, 364 F.3d 60, 65-66 (2d Cir. 2004) ("In the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the Sandin [v. Conner, 515 U.S. 472 (1995)] plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions."). Even assuming, however, that the Court were to reject this argument, Plaintiff has failed to allege sufficient facts from which the Court could plausibly infer that Dr. Patil—or any other Defendant—deprived him of that protected interest as a result of insufficient process.

At bottom, the allegations of the SAC reflect that Plaintiff simply disagreed with Dr. Patil's diagnosis and decision to place him on suicide watch. Aside from his own belief that he does not suffer from any mental health problems, Acevedo has not alleged any facts supporting a plausible inference that Dr. Patil's actions were medically inappropriate. Nor has he alleged any facts—other than conclusory assertions—suggesting that Dr. Patil acted with an improper purpose. (See, e.g., SAC at 11 ("Dr. Patil in her part, abused her authority and influence to

13

deprive me of due process, a liberty interest and diagnosed me SM1 without merit or justification in order to facilitate the states methods of torture and at the same time create plausible deniability to all involved."); id. at 12 ("Mental Health [professionals] at Green Haven were directed to misdiagnose me and start creating a mental health history while D.O.C.S. continues to torture and attempt to coerce a false confession out of me.").) Moreover, Acevedo has not identified any procedural protections to which he believes he was entitled and that were not followed.

In the absence of any supporting factual allegations suggesting that the actions of the prison staff were inappropriate, this Court, like others that have considered the issue, is hesitant to second-guess the actions of prison mental health professionals—at least where, as here, the result was a relatively temporary period of segregated confinement. See Gonzales v. Carpenter, 9:08-CV-629 LEK/ATB, 2011 WL 768990, at *11 (N.D.N.Y. Jan. 3, 2011) ("This court concludes that temporary confinement of an inmate with clear mental health problems for a total of less than 30 days for observation and evaluation in the psychiatric unit within a prison does not implicate a liberty interest."), report and recommendation adopted, 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011); Rogers v. Paquet, 3:01-CV-0969-X, 2001 WL 1148256, at *3 (N.D. Tex. Sept. 18, 2001) (concluding that plaintiff's "allegation that he was wrongfully placed in a single cell on a suicide watch has no viable legal basis" because "[s]uch classifications are generally within the broad discretion of prison officials and courts are reluctant to interfere, except in extreme circumstances"); cf. Cotter, 2014 WL 1246067, at *12-*13 (concluding that a triable issue existed as to plaintiff's due process claim, where he was placed on suicide watch for fourteen days—eight of which came after mental health professionals recommended removing him from suicide watch).

Plaintiff's claims against Dr. Patil are therefore dismissed.

14

4.    **Harassment and False Misbehavior Claims Against Correctional Officers of Sullivan Correctional Facility**

The SAC also alleges that Sullivan Correctional Officers Long, Piggs, McDonohue, Glass, Lyons, D'Addezio (sued as "DeDazzio"), Gardiner, and Sgt. LoFrese (sued as "LaFrese") "subjected [Acevedo] to unlawful coercion and coercive intimidation" and "threats" by "constantly accusing [him] of murder, rape, wife beating, [and] child molestation." (SAC at 13.) According to the SAC, these individuals taunted Acevedo, stating "We got his DNA he's guilty," told him he had "better confess," and threatened him with violence. (Id. at 13-14; see also id. at 28-29.) The SAC also alleges that on June 14, 2013, another Sullivan employee, Sgt. Bunce (sued as "Buntz") "ignored [Acevedo's] request to informally seek redress of [his] grievances." (Id. at 14.) Acevedo's "complaints fell on deaf ears and minutes later turned into a retaliatory misbehavior report being issued by the very officers [he] was complaining about." (Id.) He refers the Court to the "Bellock misbehavior report 6/14/13." (Id.)[11]

None of these allegations state a plausible claim. As the Court explained in its earlier order dismissing certain claims from Acevedo's original complaint, without a plausible allegation of actual physical injury or imminent physical harm—none of which is present here— an allegation of mere verbal abuse is insufficient to state a plausible § 1983 claim. See ECF No. 6 at 7; see also Toliver v. New York City Dep't of Corr., 10 CIV. 822, 2013 WL 3779125(RJS), at *13 (S.D.N.Y. July 8, 2013) ("[V]erbal abuse and threats of violence, even if inappropriate or reprehensible, are not actionable under § 1983, as they do not violate any protected federal right."); Alster v. Goord, 745 F. Supp. 2d 317, 337 (S.D.N.Y. 2010) ("[T]hreats or verbal

---

[11]    Acevedo also asserts in his opposition that a motion he submitted to modify his child support arrears was never received by the Suffolk County Family Court, resulting in a warrant and judgment against him for $859.95. (ECF No. 115-5 at 32-37.) Although Acevedo was incarcerated at Sullivan at the time, his opposition does not state which—if any—Defendants were involved; he asserts only that he "handed officer on B.H.U. an envelope" containing the motion. (ECF No. 115-8 at 17.) Absent some indication of any Defendant's personal involvement, these allegations are insufficient to state a plausible claim against any of the Defendants.

harassment, without any injury or damage, are not cognizable under § 1983.").

The only injury the SAC identifies—aside from the taunting and harassment—is an allegedly retaliatory misbehavior report issued by a "C.O. M. Bellock." (SAC at 14; id. ECF No. 56-4 at 43.)[12] Acevedo, however, does not allege any facts supporting a plausible inference that he engaged in constitutionally-protected conduct or that this report was retaliatory; the SAC asserts only that Acevedo's "informal[ ]" attempts to "seek redress of [his] grievances . . . fell on deaf ears and minutes later turned into a retaliatory misbehavior report." (SAC at 14.) Perhaps more importantly, even assuming that CO Bellock issued the report in retaliation for Acevedo's "complaints," Bellock is not named as a Defendant in this action. (SAC at 2-4 (listing the twenty-three named Defendants).) Acevedo has not alleged a plausible basis for holding the other Defendants liable for Bellock's allegedly retaliatory misbehavior report. These claims against the various Sullivan Defendants are therefore dismissed.

**5.      Claims Against Green Haven CO Henschel**

The SAC makes a number of allegations against Defendant Henschel, a correctional officer at Green Haven. Acevedo alleges that Henschel (1) twice pulled Acevedo out of line while he was "on vocational run," yelled at him, ripped up his "program card," and told him to change programs; (2) removed his and his cellmate's towels from their cell and ultimately had them destroyed; (3) wrote Acevedo's cellmate a "trumped up" ticket, at the hearing for which Acevedo testified; (4) verbally harassed Acevedo and threatened violence; and (5) wrote Acevedo a "ticket with trumped up charges" after an altercation, resulting in Acevedo's being placed on "keep lock" for twenty-six days and losing various other privileges, although the ticket

---

[12]      Acevedo has attached a copy of CO Bellock's misbehavior report to the SAC, as well as his subsequent appeals of the disciplinary infraction. (ECF No. 56-4 at 43-50.) In the "inmate misbehavior report," CO Bellock alleges that Acevedo threatened him and another correctional officer (who also is not named as a Defendant in this action) in the facility's shower area. (Id. at 43.)

was "later dismissed on appeal." (SAC at 7-8.)

For the reasons already described, Acevedo's first and fourth allegations do not give rise to a plausible claim: Acevedo has not alleged that the destruction of his program card caused him injury, and in the absence of an injury mere verbal harassment—no matter how inappropriate or unprofessional—does not give rise to a constitutional claim. See Toliver, 2013 WL 3779125(RJS), at *13; Walker, 2010 WL 2541711, at *12 (S.D.N.Y. June 23, 2010). Acevedo's second allegation does not state a plausible claim, either, because the alleged confiscation of his towel is a *de minimis* injury. See Zaire v. Coryer, 204 F. App'x 948, 949 (2d Cir. 2006) ("As to the confiscation of his towel, even if Zaire's allegations were true, we conclude that the act is *de minimis* and insufficient to sustain Zaire's constitutional claim."). Insofar as Acevedo attempts to assert a claim based on the ticket given to his cellmate, he lacks standing to do so.

The Court construes Acevedo's fifth allegation as attempting to assert a claim for retaliation or for a violation of disciplinary due process. To raise a retaliation claim, Acevedo must plausibly allege "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Here, Acevedo's claim fails because he has not identified the constitutional activity in which he engaged, much less alleged facts that raise a plausible inference that the act was a "substantial or motivating factor" for the disciplinary ticket.[13] See Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ("[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations.").

---

[13]    As noted above, the SAC references Acevedo's testimony at his cellmate's disciplinary hearing. Even assuming this act constitutes protected conduct, Acevedo has not alleged any facts suggesting that this testimony was a "substantial or motivating factor" behind the ticket.

Acevedo similarly does not plausibly allege that he was denied due process. In the prison setting, due process protections attach only when an inmate is deprived of a protected liberty interest—that is, when he faces an "atypical and significant hardship" in relation "to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period" of punitive segregation "automatically fails to implicate due process rights," Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004), the Circuit has explained that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual," Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009). The Circuit has suggested that courts may dismiss as a matter of law claims asserting significantly shorter periods of punitive segregation. See Palmer, 364 F.3d at 65-66 ("In the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the Sandin plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions.").

Following this suggestion, courts in this District have dismissed, on the pleadings, claims alleging only temporary periods of confinement that did not amount to "unusual" conditions of punitive confinement. See Njasang Nji v. Heath, 13 CIV. 200 CM, 2013 WL 6250298, at *9 (S.D.N.Y. Dec. 2, 2013) ("Plaintiff does not allege facts that implicate a liberty interest under Sandin because he does not allege that his 32 days in keeplock constituted an atypical hardship, when compared to the ordinary incidents prison life."); Zappulla v. Fischer, 11 CIV. 6733 JMF, 2013 WL 1387033, at *7-*8 (S.D.N.Y. Apr. 5, 2013) (same, where plaintiff spent thirty-one days "in medical isolation or keeplock" and did not plausibly allege that he endured atypical

18

conditions of confinement).

Here, Acevedo has alleged only that he was "keep locked for 26 days," and that he lost various privileges—his "Family Reunion Program," his "vocational assignment," and was transferred to a different cell block—none of which indicate that he "endured unusual" conditions beyond normal prison discipline. (SAC at 8.)  Moreover, aside from his obvious disagreement with the veracity of CO Henschel's disciplinary charge, Acevedo fails to identify what due process protection he was denied. See Davidson v. Flynn, 32 F.3d 27, 31 (2d Cir. 1994) ("[P]laintiff's conclusory allegation of [due process] violations, without any indication of what aspect of required procedure was not provided, renders his due process claim insufficient.").  Indeed, the SAC specifically alleges that the disciplinary ticket was "later dismissed on appeal" (id.)—suggesting that he was given a full opportunity to challenge the infraction.

Accordingly, the Court dismisses Plaintiff's claims against Defendant Henschel.

6.     **Claims Against Great Meadow CO's Warrington and Ely**

The SAC also asserts a number of claims against Defendants Warrington and Ely, who supervised Acevedo while he was incarcerated at Great Meadow Correctional Facility.

In particular, Acevedo alleges (1) that CO Warrington often applied too much pressure to Acevedo's handcuffs (SAC at 21); (2) that CO Warrington would recite his family's home address and phone number, which "could only have been found as a result of careful reading of [his] letters" (id.); (3) that CO Warrington, on October 15, 2012, escorted him away from his cell, at which point his cell was searched and his papers "were strewn all over," (id. at 22); (4) that on November 28, 2012, Acevedo handed CO Warrington a letter to mail and was advised by another inmate that Warrington promptly threw the letter in the garbage (id.); (5) that on the

19

same day, CO's Warrington and Ely conducted a "retaliatory" cell search and destroyed his

pillow and "net bag" (id. at 24); (6) that Acevedo was given a disciplinary ticket, alleging that he

had destroyed his pillow and "net bag" and had thrown oatmeal at Ely earlier in the day, and that

as a result of these tickets he was sentenced to thirty days in "keep lock" and ordered to pay

$12.50 in "restitution" (id. at 24-25); and (7) that after the second "retaliatory" cell search he was

missing "6 stamps .45¢ each, 20 family photos, various cases (case law) for appeal, 1 catalogue,

a list of family and friends names, addresses and telephone numbers, and 20 sheets of carbon

paper" (id. at 31).

### A.    Handcuffing Claim

The Court construes Plaintiff's first assertion as seeking to raise an excessive force claim.

To make out such a claim, however, the plaintiff must allege that the amount of force used was

"objectively sufficiently serious or harmful enough." United States v. Walsh, 194 F.3d 37, 50

(2d Cir. 1999). Although the victim need not suffer "'serious or 'significant' injury," the amount

of force used must be more than "*de minimis*." Id. (citations omitted). Applying these

principles, courts have dismissed excessive force claims based on tight handcuffing when the

plaintiff did not suffer more than temporary injury. See, e.g., Jackson v. City of New York, 939

F. Supp. 2d 219, 231 (E.D.N.Y. 2013) ("Injuries held to be *de minimis* for purposes of defeating

excessive force claims include short-term pain, swelling, and bruising, [and] brief numbness

from tight handcuffing . . . ."); Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d

459, 468 (S.D.N.Y. 2008) ("There is a consensus among courts in this circuit that tight

handcuffing does not constitute excessive force unless it causes some injury beyond temporary

discomfort.").

Here, Acevedo has not alleged that the tight handcuffing caused him more than a

temporary injury; indeed, he has not alleged that the handcuffing caused him any injury at all. In the absence of such an allegation, he has failed to allege a plausible excessive force claim. See Corsini v. Bloomberg, 12 CIV. 8058 LTS MHD, 2014 WL 2029178, at *9 (S.D.N.Y. May 15, 2014) ("Here, Plaintiff has alleged merely that he complained that the handcuffs were too tight and that he suffered "physical injury," without specifying any factual content about the injury. This conclusory allegation of injury is insufficient to plead plausibly the third element of a viable handcuffing-related claim of excessive force. Consequently, this claim is dismissed." (footnote omitted)).

### B.    Mail-related Claims

Plaintiff's second claim is that CO Warrington "and others" recited the phone number and address where his wife and children lived. (SAC at 21.) In a related allegation—the fourth of those listed above—Acevedo asserts that another inmate told him that Warrington discarded a letter that Acevedo had given him to be mailed. (Id. at 23.) Additionally, in a section of the SAC not devoted specifically to discussing claims against Warrington and Ely, Acevedo alleges that his "envelopes were opened even though they never left the facility" and that his family also sent "numerous" pieces of mail that he "never received." (Id. at 27.)

The Court construes these allegations as asserting a First Amendment claim for interference with the free flow of non-legal mail. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) ("In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."). An "isolated incident of mail tampering is usually insufficient to establish a constitutional violation"; as the Second Circuit remarked in the context of legal mail—which receives a higher degree of protection—to make out a First Amendment claim, the inmate must demonstrate that prison officials "regularly

and unjustifiably interfered" with his mail. Id. The Circuit has explained, however, that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." Id. (citing Washington v. James, 782 F.2d 1134, 1139 (2d Cir. 1986)).

Here, Acevedo has alleged that Warrington (i) on one occasion discarded his letter and (ii) knew his family's telephone number, which (unlike his family's address) Warrington could not have known without reading his letter.[14] Without more, these allegations would likely be insufficient to support a claim that officials "regularly and unjustifiably" interfered with Acevedo's mail. Id. In the SAC, however, Acevedo also alleges that "envelopes were opened" and that his family sent him "numerous pieces of mail" that he never received. (SAC at 27.) A grievance, dated October 29, 2012, that Acevedo attached to the SAC states that his family members asked him whether he had received three letters from them—which he had not—and asserts that he did not receive a birthday card and letter from early October. (SAC, ECF No. 56-2 at 7.)

Neither the SAC's allegations regarding the "numerous pieces of mail" that Acevedo received nor his grievance attempt to identify which correctional officers were to blame for his missing mail. Construed liberally, however, the SAC states a plausible interference with mail claim against Warrington, because it alleges that on November 28, 2012—less than one month

---

[14]     Insofar as Acevedo asserts that Warrington violated his constitutional rights by disclosing his family's address and telephone number to other inmates, such a claim fails. "A prison official's disclosure of information about one inmate to other inmates may give rise to a cause of action if the alleged disclosure caused plaintiff to be subjected to any harm, actual or threatened." Walker v. Shaw, 08 CIV. 10043 (CM), 2010 WL 2541711, at *12 (S.D.N.Y. June 23, 2010) (alteration omitted). Although such an allegation, if true, is surely troubling, Acevedo has not plausibly alleged that the disclosure itself caused him or his family to be subjected to harm.

after Acevedo wrote a grievance stating that he had not received a number of letters—Acevedo learned that Warrington had discarded a letter that was to be mailed. (SAC at 23; id., ECF No. 56-2 at 7.)  At this stage of the litigation, these allegations are sufficient to allege Warrington's involvement in the missing mail.  To survive summary judgment, however, Acevedo will need to demonstrate that Warrington was somehow personally involved in preventing his mail from reaching its destination, apart from this single instance.[15]

### C.    Cell Search Claims

Insofar as Acevedo asserts that Warrington, Ely, or any other Defendant violated his constitutional rights by searching his cell without justification, such a claim is squarely foreclosed by Second Circuit precedent.  In Willis v. Artuz, 301 F.3d 65 (2d Cir. 2002), the Second Circuit held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a convict might have in his prison cell."  Id. at 69 (alterations omitted).  Drawing on the Supreme Court's conclusion in Hudson v. Palmer, 468 U.S. 517, 536 (1984) ("We hold that the Fourth Amendment has no applicability to a prison cell."), the Circuit explained that even searches "conducted solely for harassment" do not implicate an inmate's constitutional rights, Willis, 301 F.3d at 68.

As for Acevedo's allegations that various property was confiscated or destroyed as a

---

[15]    Acevedo also alleges that his appellate counsel did not receive a number of letters he sent to her, "as indicated in" her February 21, 2013 letter to him, which he has attached to the SAC. (SAC at 27.)  But the February 21 letter—as well as the other letters from counsel that Acevedo has attached to the SAC—say no such thing. Rather, these letters indicate just the opposite: one specifically acknowledges receiving a letter from Acevedo (ECF No. 56-2 at 23), and another indicates that Acevedo's lawyer intended to "turn over all [his] correspondence to the next attorney who is appointed to represent you" (Id. at 24).  In the February 21 letter, Acevedo's counsel—again noting that she is turning over Acevedo's "correspondence"—indicates to the attorney assigned to replace her that she is missing the first two pages of "one letter from Mr. Acevedo." (Id. at 22).  Far from demonstrating that she did not receive Acevedo's correspondence, this statement suggests that counsel did receive his letters.  Based on its review of these attachments, the Court concludes that Acevedo's allegations that prison officials interfered with his correspondence with his lawyer do not state a plausible claim.  See, e.g. L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (explaining that, on a motion to dismiss, a court need not accept as true factual allegations "contradicted by more specific allegations or documentary evidence[ ] from the Complaint and from the exhibits attached thereto").

result of the searches, the Court construes these allegations as a claim that Acevedo was deprived of his property without due process. In these circumstances, however, such claims are not cognizable under § 1983. The Supreme Court has held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." Hudson v. Palmer, 468 U.S. 517, 533 (1984).

Applying these principles, the Second Circuit has determined that "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action." Jackson v. Burke, 256 F.3d 93, 96 (2d Cir. 2001). Accordingly, a number of courts have dismissed the claims of prisoners who asserted that they were deprived property by corrections officers. See West v. City of New York, 13 CIV. 5155(PAE), 2014 WL 4290813, at *6 (S.D.N.Y. Aug. 28, 2014); JCG v. Ercole, 11 CIV. 6844(CM)(JLC), 2014 WL 1630815, at *32 (S.D.N.Y. Apr. 24, 2014), report and recommendation adopted, 2014 WL 2769120 (S.D.N.Y. June 18, 2014); Green v. Niles, 11 CIV. 1349(PAE), 2012 WL 987473, at *6 (S.D.N.Y. Mar. 23, 2012).

Here, because the allegations in the SAC suggest that the confiscation was "effected through random and unauthorized conduct of a state employee"—as opposed to "established state procedures," see Hudson, 468 U.S. at 532-33—Acevedo has an adequate post-deprivation remedy under state tort law. He therefore cannot state a § 1983 claim based on the deprivation

of this property.[16]

### D.    False Disciplinary Ticket

Acevedo's allegation that CO Warrington issued him a false disciplinary ticket is

insufficient to state a § 1983 claim for many of the reasons described in the preceding sections of

this Opinion.

Specifically, insofar as this allegation is construed as a claim for retaliation, such a claim

fails because Acevedo has not identified the "constitutionally protected conduct" in which he

engaged, nor has he alleged facts raising a plausible inference that the act "was a substantial or

motivating factor for the adverse actions taken by prison officials." Bennett v. Goord, 343 F.3d

133, 137 (2d Cir. 2003). Nor has Acevedo stated a plausible due process claim. He alleges only

that he was given "30 days keep lock" and ordered to pay $12.50. (SAC at 25.) Thus, even if

the SAC identified the procedural protection Acevedo was denied, he has not shown that he

suffered a deprivation of liberty that implicates due process protections. See Edwards v. Horn,

10 CIV. 6194 RJS JLC, 2012 WL 760172, at *10 (S.D.N.Y. Mar. 8, 2012) (concluding that

thirty days in punitive segregation and $25.00 penalty did not constitute an "atypical or

significant" hardship).[17]

---

[16]    "When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy.  In contrast, when the deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing.  Under those circumstances, the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process." Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 465 (2d Cir. 2006) (citations omitted).

[17]    The SAC also describes another disciplinary infraction—the destruction of a handcuff key—of which Acevedo was allegedly found guilty on October 17, 2012. (SAC at 22.) Any claim related to this allegation fails for the same reasons: the SAC does not detail what, if any, punishment Acevedo received, and thus he has not plausibly alleged that he was deprived of a liberty interest such that due process protections should attach. Nor does this allegation support a retaliation claim; Acevedo alleges only that he received this ticket after "grieving" unspecified "issues." This allegation is insufficiently specific to support a retaliation claim. See Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ("[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations.").

With the exception of the claim that Warrington interfered with his mail, all of Acevedo's claims against Warrington and Ely are dismissed.

### 7.   Claims Against Supervisors at Sullivan Correctional Facility

The last set of claims Acevedo asserts are directed at various supervisory officials at Sullivan. The Court dismisses each of these claims.

#### A.   Jordan

Acevedo alleges that Lieutenant Jordan, who presided over his June 19, 2013 hearing, was "openly biased." (SAC at 16.) According to Acevedo, after refusing to rephrase a question the way Acevedo asked that it be phrased, Lt. Jordan exclaimed: "I'm not here to investigate, I'm here to take evidence and find you guilty!" (SAC at 16.) After Acevedo explained several times that he was "entitled to a fair hearing with an unbiased hearing officer," Jordan allegedly removed him from the hearing. (Id.)

The Court construes these allegations as a claim that Acevedo was denied due process at his disciplinary hearing. As described above, however, in order to be entitled to due process protections at a prison disciplinary hearing, the inmate must show that the discipline imposed constituted an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Here, although the SAC does not allege the nature of the penalty imposed after Acevedo's hearing before Lt. Jordan, a document attached to the SAC indicates that Acevedo was sentenced to thirty days' "keeplock" and lost various privileges, including his telephone privilege. (SAC, ECF No. 56-4, at 44.) Consistent with other cases that have dismissed claims based on similar sanctions—and in the absence of allegations suggesting that the disciplinary sanctions imposed as a result of this hearing were "unusual"—the Court concludes that Acevedo has not plausibly alleged a

disciplinary due process claim against Lt. Jordan. See Njasang Nji v. Heath, 13 CIV. 200 CM, 2013 WL 6250298, at *9 (S.D.N.Y. Dec. 2, 2013) ("Plaintiff does not allege facts that implicate a liberty interest under Sandin because he does not allege that his 32 days in keeplock constituted an atypical hardship, when compared to the ordinary incidents of prison life."); Zappulla v. Fischer, 11 CIV. 6733 JMF, 2013 WL 1387033, at *7-*8 (S.D.N.Y. Apr. 5, 2013) (same, where plaintiff spent thirty-one days "in medical isolation or keeplock" and did not plausibly allege that he endured atypical conditions of confinement).

### B.     Karson

Acevedo asserts a similar claim against Defendant Karson, who presided over a disciplinary hearing held on February 19, 2013. According to the SAC, at this hearing Acevedo asserted that static noise in the "surveillance audio" of the underlying incident demonstrated that the tapes had been tampered with, whereas Karson concluded that the "static pulses were background noise." (SAC at 17.) Moreover, Acevedo alleges, Karson "knows full well" that the tape "was altered" and "that unlawful coercion is occurring," because Acevedo has heard Karson say while making his rounds "He's a rapo, murderer and if we don't stop him he'll walk." (Id.) Although the SAC does not allege what penalty was imposed as a result of the hearing before Karson, a "Hearing Disposition" attached to the SAC appears to indicate that Acevedo was sentenced to three months in the SHU. (Id., ECF No. 56-4, at 21.) A subsequent letter from the facility's superintendent (Defendant Griffin), however, states that "[a]fter a review of the disciplinary disposition for the hearing held on 2/19/13," Acevedo's sanction had been reduced to forty-five days in the SHU. (Id. at 24.)

Whether forty-five days in the SHU constitutes an "atypical and significant hardship," Sandin, 515 U.S. at 484, is a somewhat unsettled question.

On the one hand, the Second Circuit in Palmer indicated that courts should generally be hesitant to dismiss claims as a matter of law unless the disciplinary sanction was less than thirty days, 364 F.3d at 66, and it reiterated that instruction in Davis v. Barrett, 576 F.3d 129 (2d Cir. 2009). There, the Circuit remanded for additional factfinding a decision dismissing a due process claim where plaintiff spent fifty-five days in SHU—even though the Court simultaneously recognized that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." Id. at 133-35.

At the same time, a number of courts in this Circuit, in cases decided after Davis v. Barrett, have dismissed claims in which plaintiffs alleged spending between forty and fifty days in punitive segregation or faced other comparable discipline. These courts concluded that, in the absence of some allegation that the conditions of keeplock or "SHU" confinement were in some way unusual, plaintiffs had failed to allege the violation of a protected liberty interest. See Santos v. City of New York DOC, 10 CIV. 3159 JPO HBP, 2012 WL 554463, at *6 (S.D.N.Y. Jan. 19, 2012), report and recommendation adopted, 2012 WL 565987 (S.D.N.Y. Feb. 21, 2012) (granting defendant's motion to dismiss where plaintiff alleged that he spent forty-five days in punitive segregation); Wilson v. Kelly, 9:11-CV-00030 MAD, 2012 WL 3704996, at *12 (N.D.N.Y. Aug. 27, 2012) ("Plaintiff's complaint fails to allege that his forty-five days of keeplock confinement was an atypical and significant hardship . . . ."); Miller v. Bradley, 9:09-CV-1035 GTS/RFT, 2010 WL 3810001, at *3 (N.D.N.Y. Aug. 6, 2010), report and recommendation adopted, 2010 WL 3809995 (N.D.N.Y. Sept. 22, 2010) (forty-three days in SHU); McEachin v. Selsky, 9:04-CV-0083 FJS/RFT, 2010 WL 3259975, at *9 (N.D.N.Y. Mar. 30, 2010), report and recommendation adopted, 2010 WL 3259982 (N.D.N.Y. Aug. 17, 2010)

(forty days in SHU); see also Vogelfang v. Capra, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012)
(inmate's allegations of sixty and ninety days spent in SHU were insufficient to state claim for
due process violation).

Here, where Acevedo has failed to allege any facts about the conditions of his
disciplinary confinement—including whether he served all of his forty-five day sentence—this
Court joins others that have addressed similarly deficient complaints and concludes that Plaintiff
has not plausibly alleged the deprivation of a protected liberty interest, such that due process
protections attached.   The claims against Karson are therefore dismissed.

### C.    Griffin, Russo, and Gueye

Lastly, Acevedo makes a number of conclusory allegations against the remaining
supervisors, all of which are insufficient to state a claim.

In particular, he alleges that by referring his grievances to Captain Russo, Superintendent
Griffin "attempts to resolve and absolve himself of responsibility by taking some action.  In fact
Supt. Griffin is aware and a participant.  Supt. Griffin initiates an investigation which never takes
place." (SAC at 15.)  Captain Russo, Acevedo alleges, "is also a participant and has joined in the
accusations and coercion when on the block and fails to correct unlawful and unconstitutional
conduct." (Id.)  Acevedo also asserts that "[t]he following supervisory officials have after being
informed, failed to correct o[r] stop abuse and are in fact a part of the conduct complained of";
his list includes Defendants Griffin, Gueye, and Russo, as well as Defendant Karson and
Defendant "Brian Fischer's successor, Annucci." (SAC at 29.)  These individuals, according to
the SAC, "say they have made an investigation and say I've been interviewed when in fact I have
never been interviewed," and "say the video and audio has been reviewed and nothing found."
(Id.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). "Both the Court of Appeals and numerous district courts in this Circuit have repeatedly held that receipt of letters or grievances is insufficient to impute personal involvement. Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison officials could name the supervisor as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the supervisor." Harris v. Fischer, 11 CIV. 6260 CM JLC, 2014 WL 3859242, at *3 (S.D.N.Y. Aug. 1, 2014).

Here, Acevedo alleges only that the Defendants failed to act on or investigate his grievances and other appeals. Moreover, although he suggests that several of the Defendants were "participant[s]" or had "joined"—he does not specify precisely what they had joined—he does not allege any facts supporting these conclusory and speculative allegations. Even assuming Acevedo is alleging that these individuals "joined" in harassment or verbal abuse, such claims are not actionable under § 1983. See Toliver v. New York City Dep't of Corr., 10 CIV. 822 RJS JCF, 2013 WL 3779125, at *14 (S.D.N.Y. July 8, 2013). The claims against these Defendants are thus dismissed.

## 8.    Leave to Amend

Having concluded that all of Acevedo's claims should be dismissed—with the exception of his interference with mail claims against Lee, Geiss, Serrano, and Warrington—the Court finally must consider whether it should grant him leave to amend.

"Generally, leave to amend should be freely given, and a *pro se* litigant in particular

30

should be afforded every reasonable opportunity to demonstrate that he has a valid claim." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014). A *pro se* complaint in particular "should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Id. Whether to grant or deny leave to amend is committed to the "sound discretion of the district court," and leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).

Here, the Court has already given Acevedo two opportunities to amend his complaint. (ECF Nos. 7, 38.) Considered together, the SAC and Acevedo's opposition total more than eight hundred pages. Moreover, in its Order granting Plaintiff leave to file the SAC, the Court warned that "[n]o further opportunities to amend shall be granted absent a showing of good cause." (ECF No. 38.) Accordingly, the Court declines to grant Acevedo leave to file a Third Amended Complaint. See Best v. City of New York, 12 CIV. 7874 RJS SN, 2014 WL 163899, at *3 (S.D.N.Y. Jan. 15, 2014) (declining to grant leave to amend, where plaintiff had already been given two opportunities to do so, and noting that "the Court can only afford [Plaintiff] so many bites at the apple"); Parker v. DeBuono, 98 CIV. 5765 (NRB), 2000 WL 223841 (S.D.N.Y. Feb. 25, 2000), aff'd sub nom. Parker v. Com'r DeBuono, 242 F.3d 366 (2d Cir. 2000) ("Leave to amend is appropriately denied where, as here, plaintiff has already had two opportunities to replead and the benefit of specific warnings as to his complaints' deficiencies.").

## CONCLUSION

Defendants' motions to dismiss are granted in part and denied in part. Specifically, all of Plaintiff's claims against all Defendants—with the exception of his First Amendment interference with mail claims against Defendants Geiss, Lee, and Warrington—are dismissed.

31

The Court also declines to dismiss the First Amendment mail monitoring claim against Serrano, at least at this stage.  Consistent with the accompanying Order, Acevedo shall submit the appropriate forms in order to effect service upon Serrano.

Additionally, by way of separate Order, the Court is referring the case to Magistrate Judge Dolinger for General Pretrial.

The Clerk of Court is respectfully requested to close the motions pending at docket numbers 93 and 98, and to terminate all Defendants from the case with the exception of Defendants Lee, Geiss, Serrano, and Warrington.

SO ORDERED.

Dated:          September 29, 2014
                New York, New York

Ronnie Abrams
United States District Judge